IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Agape Senior Primary Care, Inc., | ) | C/A: 3:16-1610-JFA |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| vs. | ) | |
| | ) | |
| Evanston Insurance Company, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Agape Senior Primary Care, Inc. ("Agape"), a conglomerate of nursing homes in South Carolina, initiated this action against its insurance company, Evanston Insurance Company ("Evanston") for breach of contract and bad faith.

The claims arise out of Evanston's conduct in several related tort claims against Agape. This case is actually a sequel to an earlier declaratory judgment action before this court, *Evanston Ins. Co. v. Watts*, 52 F. Supp. 3d 761 (2014) (the "declaratory judgment action"). That case required the court to interpret and apply provisions of the Evanston insurance policy to a unique set of facts arising out of Agape's employment of an individual who purported to be a licensed medical practitioner, but who, in reality, was an imposter assuming the identity of a licensed physician.

Now before the court are the parties' pivotal cross motions for summary judgment (ECF Nos. 42, 49), together with various other procedural motions. On December 20, 2017, oral argument was heard for the better part of the day on all pending motions. At the conclusion of argument, the court took all motions under advisement. This Order shall serve

to memorialize the court's rulings on the summary judgment motions.

I.      PROCEDURAL HISTORY

In 2012, patients of Agape brought claims against Agape after it was discovered that Ernest Addo ("Addo"), one of Agape's purported physicians, was not a licensed medical doctor.  Addo had fraudulently adopted the identity of Arthur Kennedy, M.D., a physician licensed in the United States, and duped Agape into hiring him onto the medical staff. Eventually, Addo's fraudulent conduct came to light, prompting a class action lawsuit[1] and a variety of other tort claims against Agape.[2]

Evanston issued a policy of insurance to certain Agape health care providers, including Dr. Kennedy, under insurance policy number MM-822351 (the "Policy") for the policy period August 1, 2012 to August 1, 2013.  In connection with the issuance of the Policy, Kennedy, along with other medical providers, was required to sign the insurance application.  Shortly after Addo's fraudulent conduct came to light, Evanston initiated a declaratory judgment action in this court, seeking a ruling that the Policy in question was void *ab initio* because of Addo's fraudulent misrepresentations.  At the same time, Evanston provided a defense to the underlying tort actions, reserving the right to discontinue in the event it was successful in the declaratory judgment action.

After thorough briefing and argument, this court issued a ruling essentially providing

---

[1] See *Hanna v. Agape Senior, LLC, et al.*, No. 3:12-CV-02872-JFA, 2015 WL 247906 (D.S.C. Jan. 20, 2015).

[2] The declaratory judgment action remained pending for some time because Addo had been indicted for his conduct and asserted his 5th Amendment rights in refusing to be deposed.  Accordingly, the case was stayed until the criminal case was concluded.

a split decision.  Specifically, the court ruled that the Policy was not void *ab initio* as to all medical providers as a result of Addo's misrepresentations.  The court also ruled, however, that certain claims asserted against Agape were not covered because of Addo's misconduct. Specifically, claims asserted against Addo in his individual capacity, as well as claims against Agape, the corporation, under a theory of respondeat superior for Addo's conduct, were not covered under the Policy.  Additionally, claims against Agape, the corporation, for negligent hiring and retention of Addo were similarly not covered.  Left in place by the court's ruling was coverage for all other medical professionals (*i.e.*, doctors and nurses) of Agape.  This court's determination of the coverage issue was affirmed by a panel of the Fourth Circuit Court of Appeals.  *Evanston Ins. Co. v. Agape  Sr. Primary Care, Inc.*, 636 F. App'x  871 (4th Cir. 2016).

Now before the court are claims by Agape against Evanston arising out of Evanston's conduct on several underlying tort claims against Agape.  These claims involve Evanston's refusal to defend and indemnify Agape in the tort claims, as well as Evanston's conduct in changing defense counsel, and in participating in several mediation sessions.  As will be seen, the court has determined that Evanston breached its insurance contract when it refused to continue its representation of Agape in what the parties have referred to as the "Watts litigation" and refused to indemnify Agape for the settlement of that case.

The court will dismiss, however, the bad faith claim asserted in connection with the Watts case, as well as all other bad faith claims.  The court's ruling on the cross motions for summary judgment makes it unnecessary for the court to rule on all but one of the various

other procedural motions that have been filed. Thus, those motions are dismissed as moot.[3]

## II.    LEGAL STANDARD

### A.    SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden and a properly supported motion is before the court, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 323. All inferences must be viewed in a light most favorable to the non-moving party, but he "cannot create a genuine issue of material fact through mere

---

[3] In light of the court's ruling herein on the cross motions for summary judgment, a resolution of the remaining motions is not necessary. The information sought in the cross motions to compel discovery (ECF Nos. 50, 59) is not needed to decide the substantive motions. The parties agreed that Agape's motion for partial summary judgment on Count II of Evanston's counterclaim (ECF No. 44) is moot. With regard to the affidavit of Agape executive Scott Middleton's and the proposed expert testimony of Arthur Bates, both of which are subject to a motion to strike (ECF Nos. 43, 71), the court has been required to briefly review the information contained in both of the disputed documents and finds that neither is helpful to the court in resolving the summary judgment motions. Therefore, although the court heard considerable argument on all of these additional motions, a resolution of them is not necessary.

speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## B. BREACH OF CONTRACT

Under South Carolina law, a plaintiff seeking to establish breach of contract "must establish three elements: (1) a binding contract entered into by the parties; (2) breach or unjustifiable failure to perform the contract; and (3) damage as a direct and proximate result of the breach." *Advanced Pain Therapies, LLC v. Hartford Fin. Servs. Group, Inc.*, No. 3:14-CV-0050-MGL, 2014 WL 4402800, at *2 (D.S.C. Sept. 3, 2014) (citing *Bank v. How Mad, Inc.*, No. 4:12-CV-3159-RBH, 2013 WL 5566038, at *3 (D.S.C. Oct. 8, 2013)).

## C. THE DUTY TO DEFEND AND TO INDEMNIFY

"Under South Carolina law, 'the obligation of a liability insurance company to defend and indemnify is determined by the allegations in the complaint.'" *Liberty Mut. Fire Ins. Co. v. General Info. Servs., Inc.*, 22 F. Supp. 3d 597, 600 (E.D. Va. 2014) (citing *Collins Holding Corp. v. Wausau Underwriters Ins. Co.*, 397 S.C. 573, 577, 666 S.E.2d 897, 899 (2008)). "If the facts alleged in the complaint fail to bring a claim within the policy's coverage, the insurer has no duty to defend." *Id.* "The insured must show that the underlying complaint creates a 'reasonable possibility' of coverage under the insurance policy." *Id.* at 600–01 (citing *Gordon Gallup Realtors Inc. v. Cincinnati Ins. Co.*, 274 S.C. 468, 471, 265 S.E.2d 38, 40 (1980)). "The burden of proof is on the insured to show that a claim falls within the coverage of an insurance contract," and "[t]he insurer bears the burden of establishing exclusions to coverage." *Id.* at 601 (internal quotations omitted) (citing *Sunex Int'l, Inc. v.*

*Travelers Indem. Co.*, 185 F. Supp. 2d 614, 617 (D.S.C. 2001)).

The duty to defend is triggered where the underlying complaint includes "any allegation" that raises the possibility of coverage. *Auto-Owners Ins. Co. v. Newsom*, No. 4:12-CV-447-RBH, 2013 WL 3148334, at *4 (D.S.C. June 19, 2013). ("South Carolina law requires that a triggered insurer with a duty to defend the policyholder in a suit must defend the policyholder against all claims in that suit, even those claims that are not covered under the policy."). "In short, if there is even one aspect of the claim which must be defended, the insurer must defend the entire suit." *Baran, Inc. v. Landmark Am. Ins. Co.*, No. 2:09-CV-1556-PMD, 2010 WL 233861, at *4 (D.S.C. Jan. 14, 2010) (citing *Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 319 S.C. 12, 15, 459 S.E.2d 318, 319 (Ct. App. 1994)).

Finally, the duty to defend is broader than the duty to indemnify. *Ross Dev. Corp. v. Fireman's Fund Ins. Co.*, 809 F. Supp. 2d 449, 457 (D.S.C. 2011).

D.      BAD FAITH

The Supreme Court of South Carolina has determined that "there is an implied covenant of good faith and fair dealing in every insurance contract 'that neither party will do anything to impair the other's rights to receive benefits under the contract.'" *Tadlock Painting Co. v. Maryland Cas. Co.*, 322 S.C. 498, 500, 473 S.E.2d 52, 53 (1996) (citing *Nichols v. State Farm Mut. Auto. Ins. Co.*, 279 S.C. 336, 339, 306 S.E.2d 616, 618 (1983)). The court has also held that "if an insured can demonstrate bad faith or unreasonable action by the insurer in processing a claim under their mutually binding insurance contract, he can recover consequential damages in a tort action." *Nichols*, 279 S.C. at 340, 306 S.E.2d at 619.

Moreover, South Carolina law provides for a recovery of attorneys' fees where an insurer has refused to pay a claim in bad faith. S.C. Code Ann. § 38-59-40 (West 2018).

III.    ANALYSIS AND APPLICATION

    A.    THE WATTS LITIGATION

On December 4, 2015, the Estate of a former patient of Agape filed a lawsuit styled "*Vickie Watts, as Personal Representative of the Estate of Dorothy E. Jones v. Agape Senior Primary Care, Inc., and Agape Nursing and Rehabilitation Center, Inc.*, in the Richland County Court of Common Pleas, 2015-CP-40-5417 (the "Watts litigation"). Evanston initially provided a defense to this state court litigation, under a reservation of rights. When the Fourth Circuit Court of Appeals affirmed this court's ruling on the critical coverage issue, Evanston terminated its representation of Agape, contending that the claims asserted by the Watts litigation were not covered under this court's ruling.

Upon Evanston's withdrawal, Agape employed its own counsel to continue defending the case, expending $5,750 for defense costs and ultimately settled the case for $63,750. Evanston's conduct with regard to the Watts litigation has given rise to claims by Agape for breach of contract, both in terms of Evanston's failure to continue to defend and failure to indemnify, as well as a bad faith claim in connection with Evanston's abandonment of the Watts litigation.

Evanston, on the other hand, contends that the claims asserted in the Watts litigation were clearly not covered under this court's earlier ruling and, therefore, it acted within its contractual rights when it abandoned the litigation and denied coverage.

As noted previously, when determining an insurer's duty to defend, the allegations of the underlying complaint must be scrutinized in order to decide whether such a duty exists. *Liberty Life Ins. Co. v. Commercial Union Ins. Co.*, 857 F.2d 945, 949 (4th Cir. 1988); *S.C. Med. Malpractice Liab. Ins. Joint Underwriting Assoc. v. Ferry*, 291 S.C. 460, 463, 354 S.E.2d 378, 380 (1987).

The court is thus required to carefully examine the Watts Complaint[4] and see if any of its allegations "raise a reasonable possibility that the insured may be held liable for some act or omission covered by" the Policy. See *Liberty*, 857 F.2d at 949.

Unfortunately, the Watts Complaint at issue is, to be charitable, poorly drafted. After approximately one page of allegations appearing under a subheading "PARTIES, JURISDICTION AND VENUE," there appears a series of paragraphs under the subheading "FACTS." *See* ECF No. 4-5 p. 6–9. Certain of these paragraphs can be construed to allege misdeeds on the part of medical professionals employed at Agape other than Addo. The three paragraphs that principally assert claims against other Agape employees are as follows:

15.  Two days later, an Agape nurse practitioner noted that Ms. Jones's Glucotrol needed to be changed, but nothing was done and Ms. Jones's Glucotrol remained suspended.

16.  On March 13 and 14, Ms. Jones's blood sugar readings climbed as high as 190 and 192, but no action was taken.

\* \* \*

20.  The lab results received by Agape on March 14 indicate Ms. Jones was suffering from an increased white blood cell count and acute kidney failure consistent with severe dehydration. Ms. Jones's sodium level

---

[4] Specifically, this court examined the Watts plaintiff's First Amended Complaint, which was attached as Exhibit D to Evanston's Motion to Dismiss filed in the present case. (ECF No. 4-5).

[sic] was elevated at 148, potassium level was elevated just below panic levels at 6.4, creatinine level was elevated at 4.87, her blood urea nitrogen ("BUN") exceeded panic levels at more than 130, and her glomerular filtration rate ("GFR") was only an 8, which is indicative of Stage V kidney failure. Additionally, Ms. Jones's CO2 level was very low (14 mEq/L), which is indicative of respiratory alkalosis or metabolic acidosis. Furthermore, her anion gap level was 25.4, indicating metabolic acidosis, which is often related to uncontrolled diabetes.

Following these paragraphs, the First Amended Complaint sets out two specifically delineated causes of action. The first one, appearing on page 5 of the Watts Complaint (ECF No. 4-5 p. 9), begins as follows:

FIRST CAUSE OF ACTION
(Negligent, Careless, and/or Reckless Hiring,
Retention, and Supervision).

In the paragraphs following this subheading, it is clear that the Watts Complaint was asserting a cause of action (*i.e.*, negligent hiring of Addo, etc.) that was not covered under this court's ruling in the declaratory judgment action.

Thereafter follows a second cause of action, delineated as follows:

FOR A SECOND CAUSE OF ACTION
(Battery)

In the paragraphs that follow this subheading, it is clear that the claim being asserted is one for battery. Specifically, each time Mr. Addo, the imposter, touched a patient, the touching was done without the patient's consent and constituted common law battery. This cause of action is also not covered by virtue of the court's earlier ruling.

In sum, therefore, the court is faced with construing a complaint that contains, in its introductory paragraphs, allegations of misdeeds of Agape employees other than Mr. Addo,

which arguably would trigger coverage under the Policy. But when one comes to the portion of the Watts Complaint where the causes of action are specifically denominated as such and claims are asserted, the two claims therein are clearly not covered by this court's declaratory judgment ruling.[5] As noted above, the Watts Complaint is inartfully drafted.[6] It should also be remembered that it was drafted before this court's ruling on coverage was issued. Nevertheless, the court is faced with the difficult task of determining whether the allegations of the Watts Complaint, imperfect as they are, trigger coverage.

Viewed in this light, the Watts Complaint is a mishmash of allegations, including two claims that are clearly barred by this court's earlier ruling in the declaratory judgment case, but also including claims of misdeeds by nurses and perhaps other medical professionals that would be covered under the court's ruling. As the South Carolina Supreme Court has noted, "[i]n construing a complaint, . . . the court must review the entire pleading." *Doe v. Barnwell School Dist.*, 369 S.C. 659, 663, 633 S.E.2d 518, 520 (Ct. App. 2006) (citing *Smith v. Nelson*, 83 S.C. 294, 300, 65 S.E. 261, 263 (1909). For this reason, the court concludes that Evanston breached its contract by refusing to continue to defend the Watts lawsuit and by refusing to indemnify Agape for the settlement paid.[7] Accordingly, judgment will be entered in favor

---

[5] The court notes, for what it is worth, that the initial allegation of each cause of action is a standard sentence alleging: "Each of the foregoing paragraphs are incorporated herein."

[6] The relevant South Carolina pleading rule (Rule 8(a), S.C. Rules of Civil Procedure), is identical to the federal rule, elegant in its simplicity. It requires that a complaint contain "(2) a short and plain statement of the claim showing the pleader is entitled to relief . . . ." This Rule is disregarded on a regular basis in complaints filed in both federal and state courts in South Carolina.

[7] As noted previously, the duty to defend is broader than the duty to indemnify. Accordingly, the decision on the indemnification question is a closer call than the duty to defend question. Nevertheless, after

(continued...)

of Agape, and against Evanston in the sum of $5,750 representing defense costs, and $63,750 representing indemnity costs. Prejudgment interest will be added to these two awards.

A determination by this court that Evanston breached the contract in regard the Watts litigation does not mean, necessarily, that Evanston acted in bad faith in doing so. In other words, not every refusal to provide coverage results in a legitimate bad faith claim.

The court's determination that Evanston breached the contract by refusing to continue its representation in the Watts litigation was not an easy one. Indeed, this court had to labor long and hard over the provisions of a poorly drafted complaint and, ultimately, sided with the insured to find that coverage existed for the claims asserted in the Watts litigation. Because the call was so difficult for this court, it naturally follows that Evanston cannot be held to have acted in bad faith or unreasonably when it refused coverage. As noted earlier, Evanston dutifully provided a defense to the Watts state court litigation while the declaratory judgment action was pending in this court, and, also while this court's decision was on appeal. It was only after the Fourth Circuit Court of Appeals affirmed this court's decision that Evanston abandoned the Watts litigation.

In sum, the decision on whether the Watts Complaint triggered coverage was a close question. Reasonable minds could disagree. This court has ultimately disagreed with Evanston on the coverage question and this court's ruling will make Agape whole. It does not follow, however, that the court's ultimate conclusion means that Evanston acted in bad

---

[7](...continued)
close examination of the claims asserted and applying traditional South Carolina contract law principles, the court has determined that Evanston owed Agape both a defense to, and indemnification for, the Watts litigation.

faith. There must be some cases where the coverage issue is so close that a bad faith cause of action does not arise as a matter of law. Surely the law cannot provide that every time a carrier improperly denies coverage, it is guilty of acting in bad faith. Some cases present such a close call that a bad faith claim fails as a matter of law. This is such a case.

As Judge Henry M. Herlong of this District has noted, in order to sustain a bad faith claim in an insurance setting, the insured must show "there was no reasonable basis to support the insurer's decision to deny coverage under a mutually binding insurance contract." *CRC Scrap Metal Recycling, LLC v. Hartford Casualty Ins. Co.*, No. 7:12-CV-146-HMH, 2012 WL 4903661, at *7 (D.S.C. Oct. 15, 2012) (citing *Dowling v. Home Buyers Warranty Corp.*, 303 S.C. 295, 297, 400 S.E.2d 143, 144 (1991). Here, Evanston's decision regarding coverage was incorrect, but this court is not prepared to say there was no reasonable basis for its decision.

Accordingly, the court will grant summary judgment to Evanston on the bad faith claim arising out the Watts litigation.

B. REMAINING BAD FAITH CLAIMS

Agape contends that other conduct by Evanston in related litigation, apart from the Watts lawsuit, gives rise to additional claims for bad faith and unreasonable conduct by Evanston. These claims may be divided into two discrete parts.

First, Agape claims that Evanston improperly and unnecessarily decided to change defense firms in the middle of the prior claims litigation, thereby increasing defense costs and eroding benefits available to Agape under the Policy. Second, Agape contends that

Evanston's behavior in several mediation sessions was improper and should give rise to bad faith claims as well. Because they are independent of each other, the court will address these claims seriatim.

   1.   *The Changing of Defense Firms*

Initially, Evanston hired the Columbia, South Carolina law firm of Turner Padget Graham and Laney ("Turner Padget") to undertake the defense of all litigation arising out of Addo's impersonation of a physician. At some point, Evanston made the decision to discharge Turner Padget from further representation and hire another firm, Smith Whitley, in place of Turner Padget. Because the litigation had been pending for some time, it was necessary for Smith Whitley to expend additional resources to become familiar with the files in the cases and be brought "up to speed" on the status of the litigation. The parties appear to agree that this expenditure of time by Smith Whitley resulted in $47,996 additional billing against the Policy. Although the relevant policy language clearly provides that Evanston has the authority to employ the attorneys it deems most appropriate, and thereby had the contractual right to change law firms, Agape contends that the additional expenditure of money required by the substitution of law firms damaged it in view of the fact that the Policy in question is an "eroding" policy. In other words, defense costs are subtracted from the policy limits, and it is possible that coverage could be exhausted sooner because of the change in law firms, to the ultimate detriment of Agape, the insured.

In addition to arguing that it had the unilateral right to switch law firms, Evanston points out that it has agreed to not charge the $47,996 (incurred by Smith Whitley to become

familiar with the lawsuit) against the policy limits.  In response, Agape contends that this decision was not made until *after* the present litigation was brought, and so, at the very least, Agape should be entitled to recover attorneys' fees involved in bringing this law suit which served as a catalyst to the concession made by Evanston.

The court has determined that no ruling on this question is appropriate at the present time.  Both parties agree that the policy coverage has not, in fact, been exhausted.  It is well established that federal courts do not issue advisory opinions.  Erwin Chemerinsky, *Federal Jurisdiction*, 46 (7th Ed. 2016).  At this point, there is no way to know if the Policy will, in fact, be depleted. Accordingly, the more prudent course of action is for the court to dismiss this claim without prejudice, to be reasserted, if necessary, if and when the Policy coverage is exhausted.

### 2. *Evanston's Participation in Various Mediation Sessions*

Agape contends that Evanston engaged in bad faith practices in connection with its participation in state-ordered mediation on the underlying prior claims.  More specifically, Agape contends that the attorney sent on behalf of Evanston to participate in the mediation sessions, Paul Fields, was "the lead attorney then suing [Agape] on the coverage issue."  It is argued that Fields' entire purpose of attending the mediation sessions was to "check the box" for participation and to engage in what amounted to meaningless mediation.  It is argued that Fields' attendance violated South Carolina Mediation Rule 6(b)(4), which requires the physical presence of "a representative of the insurance carrier who is not the carrier's outside counsel and who has full authority to settle the claim."

The mediation sessions at issue consisted of what the parties describe as a "marathon" session involving five or six (the exact number is not clear) individual lawsuits. They were apparently mediated back-to-back and spanned two full days. Significantly, notwithstanding Mr. Fields' participation and suspect motivation, one of the cases settled at the mediation.

On the record before it, this court is compelled to conclude that no bad faith claims arise from the conduct of mediation, even if that conduct is taken in the light most favorable to the nonmoving party.

Implicit in the criticism of attorney Fields' attendance at the mediation session is the insinuation that some other attorney, free of Fields' conflict of interest, could have been sent to the mediation. The problem with this argument is that *any* attorney employed by Evanston and directed to attend the mediation on its behalf would have labored under exactly the same conflict of interest as Fields. Evanston was, at the time, defending Agape under a reservation of rights, while, at the same time, litigating with Agape over the coverage issue. Such a course of action is not unusual when tort litigation is brought against an insured and a coverage dispute arises.

In short, Evanston was acting within its rights at the time of the mediation session. Had it sent another attorney from Mr. Fields' firm, another attorney from another firm, or in-house counsel, the attorney so chosen would have been in the same situation as Fields: In a room attempting to mediate and settle a case while the attorneys' employer (Evanston) was in active litigation with the insured (Agape). If there is blame to be ascribed here, it is the South Carolina mediation rule that compels a party to mediate while there is a coverage

question pending in parallel litigation.[8] Moreover, as noted previously, one of the cases *did* settle at mediation with Fields' participation.

Finally, in order to assert a bad faith claim, the plaintiff must prove, among other things, damages flowing from the conduct at issue. *Advanced Pain Therapies, LLC,* 2014 WL 4402800, at *2. In the case of misbehavior at mediation (in terms of sending the "wrong" attorney), the plaintiff would have to prove that the conduct complained of served to somehow torpedo an otherwise favorable settlement. Such a conclusion would almost, of necessity, rest on speculation.

Agape does not direct the court to any South Carolina decision recognizing a claim for bad faith stemming from conduct at a mediation session, and this court has found none.

In sum, this court is not inclined to give birth to a new cause of action for misconduct in mediation when the South Carolina courts have not recognized such a cause of action; when any other attorney sent by Evanston would have been equally objectionable; when the empirical facts (*i.e.*, one case did settle) demonstrate that Fields' participation did not necessarily hinder a settlement; and when damages, if any from the bad faith claim, would be speculative in the extreme.

## IV. CONCLUSION

For the foregoing reasons, the court grants summary judgment to Agape on its claim against Evanston for breach of contract for failure to defend the Watts lawsuit and failure to indemnify the settlement paid in the Watts litigation (ECF No. 42). These claims, which

---

[8] It is to prevent situations such as this that this court does not include a one-size-fits-all, "drop dead" mediation deadline in its scheduling orders. Sometimes unique circumstances compel a more flexible date.

involve undisputed amounts, are for $5,750 and $63,750, respectively, and judgment shall be entered by the Clerk in favor of Agape on these claims.

Because the claims are for a liquidated amount, the court will award prejudgment interest at the South Carolina statutory rate (8%), pursuant to S.C. Code Ann. § 34-31-20 (West 2018). The parties are directed to confer in an attempt to calculate prejudgment interest from the appropriate dates[9] and report these calculations to the court within twenty-one (21) days from the date of this Order. The Clerk shall defer entering judgment in this case until the court issues a final order including the interest calculation.

Summary judgment is granted to Evanston on all remaining actions (ECF No. 49), except for the bad faith claim relating to the change in law firms, which is dismissed without prejudice. The other pending motions relating to discovery, expert testimony, and affidavits are all dismissed as moot. *See* (ECF Nos. 50, 59, 71).

IT IS SO ORDERED.

January 19, 2018                         Joseph F. Anderson, Jr.
Columbia, South Carolina                 United States District Judge

---

[9] The dates that prejudgment interest begin to run do not appear in the record.